

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## OKLAHOMA

**FILED**

JUN 1 9 2020

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

**THE NOLC, INC.**
**and other similarly situated**
**2307 Britton Drive**
**Dallas, Texas 75216**

**BRUCE CARTER and others similarly**
**situated**
**2307 Britton Drive Dallas,**
**Texas 75216**

*Plaintiffs,*

vs.

**THE UNITED STATES OF AMERICA**

SERVE ON:
William P. Barr, Esq.
Attorney General of the United States
United States Department of Justice 950
Pennsylvania Ave NW Washington, DC
20530-0001

**and**

**THE UNITED STATES**
**SMALL BUSINESS ADMINISTRATION**

SERVE ON:
Chris Pilkerton, Esq. Office
of General Counsel 409 3rd
Street SW Washington, DC
201416

**and**

**CIVIL ACTION**

NO. 20 CV - 294 GKF - JFJ

**JURY TRIAL DEMANDED**

1

**JOVITA CARRANZA,**
**in her Official Capacity as**
**Administrator of the Small Business**
**Administration**

SERVE ON:
Office of General Counsel
409 3rd Street SW
Washington, DC 201416

**and**

**STEVEN MNUCHIN,**
**in his Official Capacity as**
**United States Secretary of the Treasury**

SERVE ON:
United States Department of the Treasury
Office of General Counsel
1500 Pennsylvania Ave NW
Washington, DC 20220

*Defendants.*

### CLASS ACTION COMPLAINT

Amid our country's handling of the novel coronavirus pandemic, the United States government enacted an extraordinary piece of legislation attempting to inject trillions of dollars into our economy. As part of this legislation, the Small Business Administration, in conjunction with the Department of Treasury, doled out nearly $350 billion to "small" businesses (those with less than 500 employees). However, our government left many small businesses in the lurch.

A vast majority of minority-owned and woman-owned businesses were entirely shut out of this program by the actions taken by the government. While many larger businesses were able to rush to banks to take advantage of the opportunity to participate, **most of the minority- owned and woman-owned small businesses were never even given the opportunity to submit an application for the program before the money ran out**. Moreover, to the extent these minority-owned and woman-owned businesses were even able to participate, many of them would receive far less benefit from the program than other businesses.

This is a direct result of the government's discriminatory actions.

Plaintiffs, The NOLC, Inc. ("Plaintiff NOLC") and Bruce C. Carter ("Plaintiff Carter"), bring this lawsuit on behalf of themselves and others similarly situated against the U.S. Small Business Administration ("Defendant SBA"), Jovita Carranza ("Defendant Carranza") in her official capacity as Administrator of Defendant SBA, the United States of America (the "USA"), and Steven Mnuchin ("Defendant Mnuchin") in his official capacity as Secretary of the Treasury (collectively, the "Defendants") seeking all available relief under the equal protection of the Fifth Amendment, and state as follows:

## I.  **INTRODUCTION**

This lawsuit seeks to uphold the core of America "Life, Liberty and The Pursuit of Happiness. It is Plaintiff's belief that the US Small Business Administration (SBA) egregiously and lawlessly failed to protect Underserved and Rural community small businesses from financial hardships due to COVID-19. The US federal government passed H.R. Bill 748 C.A.R.E.S. ACT with the intent of preserving the thirty million small businesses in America according to SBA.

Despite SBA's full knowledge of America's 30 million small businesses it failed to provide guidelines that would ensure processing and disbursement of Paycheck Protection Program funds and metered EIDL grants. EIDL grants according to the bill were to provide emergency assistance up to $10,000.00 to small businesses within 3 days after application. Despite information from a coalition of small businesses and congress that guidelines as of April 10th were failing socially and economically business owners, SBA as of June 19th has not provided guidelines to protect the existence of said businesses.

It was the Sense of the Senate in the C.A.R.E.S ACT that the SBA Administrator provides agents with guidelines that protect small businesses. The Sense of Senate states: "It is the sense of the Senate that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially

and economically disadvantaged individuals (as defined in section 8(d)(3)(C)), women, and businesses in operation for less than 2 years."

Failure to comply with the Sense of the Senate has led to underfunding or non-funding for the most vulnerable small businesses. Without guidance, lenders have been allowed to circumvent the law and discriminate against certain groups.

1.      On March 27, 2020, President Donald J. Trump signed the Coronavirus Aid, Relief, and Economic Security Act, H.R. 748 ("CARES Act") into law. This legislation created a new Paycheck Protection Program ("PPP") to permit COVID-19-impacted small businesses (under 500 employees), nonprofits, and individuals to obtain loans via the 7(a) Loan Program ("PPP Loans"). The CARES Act temporarily (from February 15, 2020 through June 30, 2020) increased the total 7(a) Loan Program amount to $349 billion.

2.      During a time of national and global crisis, Defendants were given the unique and tremendous charge of providing relief to small business owners through administration of these small business loans pursuant to the PPP. Yet, Defendants chose to pick winners and losers - the winners being non-minority and non-woman owned small businesses.

3.      Defendants failed to appropriately protect the interests of a large part of this country's economic engine – sole proprietorships, [1] self-employed individuals, or independent contractors ("Non-employer Businesses") – by giving preference to businesses who maintained W-2 employees on payroll. In fact, Defendants knowingly, intentionally, and illegally discriminated against minority-owned and woman-owned Non-employer Businesses.

4.      Defendants exacted this scheme by preventing Non-employer Businesses, which are disproportionately owned by minorities and women, from submitting applications and failing to provide

---

[1] A limited liability company (or LLC) that does not make a simple S-Corp election is treated, for tax purposes, as a sole proprietor

4

guidance to allow for the processing of loans for Non-employer Businesses. By the time, the Defendants allowed these Non-employer Businesses to submit applications, the money was gone -- nearly $350 billion.

## II.     PARTIES

5.      Plaintiff NOLC, Inc. is a Non-Profit entity organized on February 27, 2020 under the laws of the state of Texas. NOLC is Social Welfare Organization It is operated by Bruce Carter who is an individual residing in Dallas, Texas. This entity is solely minority owned and operated.

6.      Plaintiff Bruce C. Carter is an individual who has dedicated the last 20 years working in underserved communities all across America. He is an African American man who currently resides in Dallas, Texas.

7.      Defendant Jovita Carranza is the current administrator of the United States Small Business Administration and has been in this position throughout the entirety of the relevant time period.

8.      Defendant SBA is a government department organized under the laws of the United States of America whose purpose is to provide service and support to small businesses in the United States. Per its website, Defendant SBA "has worked to ignite change and spark action so small businesses can confidently start, grow, expand, or recover."

9.      Defendant Mnuchin is the Secretary of the Treasury and has been in this position throughout the entirety of the relevant time period.

## III.    JURISDICTION AND VENUE

10.     The subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 as this is a civil action arising under the Constitution and laws of the United States; specifically, these claims arise pursuant to 42 U.S.C. § 1983.

11.     Venue lies in this District pursuant to 28 U.S.C. § 1391(e) as this is a judicial district in which the Plaintiffs reside.

IV.    **FACTS**

### A.    Facts Common to All

12.    The CARES Act is the largest economic relief bill in United States history. As enacted, the CARES Act allocates $2.2 trillion to support individuals and businesses that are affected by the COVID-19 pandemic wreaking havoc on the global economy.

13.    The CARES Act expanded the eligibility criteria for borrowers to qualify for SBA loans through the institution of the PPP. The PPP was purportedly made available to small businesses with payroll employees, eligible non-profit organizations, veterans' organizations, and tribal businesses per the Small Business Act.

14.    The PPP was also intended to be made available to self-employed individuals, sole proprietors, and independent contractors.

15.    The CARES Act does not specify as to when and how the PPP funds would be distributed, nor does it provide enough guidance or criteria as to how recipients of PPP funds would be determined. This was left to the discretion of Defendants and their employees and officers.

16.    Defendants were tasked with the implementation of the PPP and were also responsible for issuing guidance to assist potential borrowers in successfully completing and submitting loan applications.

17.    Defendants were also in charge of deciding when the application process would open, and to whom it would be available. Pursuant to this, Defendants scheduled two separate application periods for the PPP loans.

18.    The first application period began on Friday, April 3, 2020. This application period was specifically designated for businesses with up to 500 W-2 employees.

19.    The second application period began one week later, Friday, April 10, 2020. This application period was designated for Non-employer Businesses. These individuals and entities were prevented from submitting PPP loan applications or otherwise accessing the allocated funds before Friday, April 10, 2020. In addition, the guidance for these loan applications was not released until late in the day

on Tuesday, April 14, 2020 -- practically not allowing the Non-employer Businesses to apply until Wednesday, April 15, 2020.[2]

20.      Defendants did not provide any explanation or policy reasoning to justify the separate application periods.

21.      On or about April 16, 2020, Defendant SBA announced on its website that it is "unable to accept new applications for the Paycheck Protection Program "PPP" based on available appropriations funding. Similarly, we are unable to enroll new PPP lenders at this time."[3] The general consensus on this announcement is that the PPP funds had been exhausted, and there was no more money available to fund PPP loans for any individual or entity.

22.      The first wave of applicants, businesses with payroll employees, was given a 14- day window of opportunity to apply for the PPP loans before the funds were exhausted. In contrast, the second group, Non-employer Businesses, only had a one-day window to apply before the funds were exhausted.

23.      Defendants   knew   that   discriminating   against   Non-employer   Businesses   would disproportionately harm businesses owned by minorities and women.[4]

24.      9.9 million firms in the United States were owned by women, with 89.5% of those being Non-employer firms.[5]

---

[2] https://home.treasury.gov/system/files/136/Interim-Final-Rule-Additional-Eligibility-Criteria-and-Requirements- for-Certain-Pledges-of-Loans.pdf

[3] https://www.sba.gov/page/coronavirus-covid-19-small-business-guidance-loan-resources (accessed as of 4/16/2020)

[4] https://www.sba.gov/sites/default/files/advocacy/Non-employer-Fact-Sheet.pdf;
https://www.mbda.gov/sites/mbda.gov/files/migrated/files-attachments/SBO_Facts_BOB.pdf;
https://www.mbda.gov/sites/mbda.gov/files/migrated/files-attachments/Black%20Women%20Entrepreneurs.pdf

[5] https://www.census.gov/newsroom/press-releases/2015/cb15-209.html

25.     Approximately 79% of all white-owned businesses and 96% of black-owned businesses are Non-employer, respectively. "Non-employer businesses. Play a larger role amongst black-owned businesses than they do amongst white-owned businesses.[6]

26.     It has been widely reported by many congressional leaders that this very discrimination has occurred in the implementation of the PPP.

### B.     Facts Specific to Plaintiff NOLC, INC.

27.     Plaintiff NOLC ("Plaintiff NOLC" or "the business") is a Non-Profit Corporation, organized on February 27, 2020 under the laws of the state of Texas. Plaintiff NOLC is operated by Bruce Carter ("Mr. Carter") who is an individual residing in Dallas, Texas.

28.     NOLC has not filed a tax return.

29.     Plaintiff NOLC is a Non-Profit Organization that is a Social Welfare Organization that addresses Civil Rights by tackling systemic, economic, judicial, and political oppression.

30.     Plaintiff NOLC business model is year-round.

31.     All of the business activities that Plaintiff NOLC planned to host have either been cancelled or indefinitely postponed due to the COVID-19 pandemic and social distancing policies enacted by state and local and federal governments. Plaintiff NOLC's only current source of revenue is its potential donations online, which are inadequate for operations.

32.     Plaintiff NOLC applied for a PPP loan through Simmons Bank on April 4, 2020. Plaintiff NOLC had and continues to have an ongoing banking relationship with Simmons Bank. Plaintiff NOLC applied for the relief funds under Simmons Bank's PPP application process.

33.     At the time Plaintiff NOLC applied, the PPP application required the applicant to upload its payroll records. Plaintiff NOLC does not have any employees, and thus there were no payroll records to submit. Plaintiff NOLC completed the application without submitting any payroll records. On April 4, 2020,

---

[6] Bruce Carter, *Entering Entrepreneurship: Racial Disparities in the Pathways into Business Ownership,* October 2019 (https://socialequity.duke.edu/wp- content/uploads/2019/10/Entering-Entrepreneurship.pdf); citing US Census 2012 Survey of Business Owners (https://www.census.gov/library/publications/2012/econ/2012-sbo.html)

Plaintiff NOLC received acknowledgement that its application had been received.

34.     On April 16, 2020, Plaintiff NOLC received additional correspondence from Simmons Bank stating that the funds had been exhausted.

35.     On April 23, 2020, Plaintiff NOLC received a telephone call from Carole Davis, Senior Vice President of Simmons Bank indicating that Simmons Bank Management had approved the processing of the loan with a required letter from SBA. NOLC spoke with Derenda Fisher at SBA and she stated she could not provide a letter, however if Plaintiff had paid invoices or had contracts, that was sufficient as to conducting business. Carter emailed both Derenda Fisher and Carole Davis on April 29, 2020 (See Exhibit 5, attached hereto and incorporated by reference herein for all intended purposes.)

36.     On May 12, 2020 Lori S. Baldock, President of Simmons Bank, Fort Worth, Texas Market informed the NOLC that Simmons Bank was unable to approve the Applicant's request for a PPP Loan. As of the date of the filing of this Complaint, Plaintiff  NOLC has not received any funding under the C.A.R.E.S. ACT.

**37.     Facts Specific to Plaintiff Bruce C. Carter**

38.     Plaintiff Bruce C. Carter ("Plaintiff Carter") is an individual currently residing in Dallas, Texas.

39.     Since 2000, Plaintiff Carter has owned and operated small businesses in the following industries, Real Estate Development, Logistics and Educational Services. Plaintiff Carter operates his business out of commercial offices in Dallas, Texas and Washington, D.C.

40.     On March 31, 2020 Plaintiff Carter had filed for the EIDL Emergency Grants requesting $10,000.00 for each application. Applications were filed for the following businesses, NOLC, Inc., Bruce C. Carter and Value of A Life. On May 4, 2020 Plaintiff made another EIDL Grant application for his business, Opportunity Centers of America and all applications were denied or not funded.

41.     Plaintiff Carter's businesses requires regular face-to-face meetings with both current and potential clients. Plaintiff Carter is often required to travel to clients' homes or businesses to meet with them.

Plaintiff Carter also regularly attends seminars, networking events, and marketing events in order to sustain and build his business, as well as to meet potential clients.

42.     Since the COVID-19 pandemic has escalated the across the country, Plaintiff Carter has experienced a substantial decrease in business revenue such that he has reported no income for the First and Second Quarters of 2020.

43.     This decline is directly attributable to the COVID-19 pandemic and social distancing policies enacted by state, local and federal governments. Plaintiff Carter is no longer able to meet with clients in person, and most of his business cannot be effectively conducted over the phone or via videoconferencing. Plaintiff Carter cannot bring in new clients, nor can he generate income through existing ones. Most of Plaintiff Carter's clients are not in a position to afford to pay his fees under the current economic conditions.

44.     Plaintiff Carter learned of the EIDL Grant program on March 27, 2020. He made application directly to SBA March 31, 2020 and on May 4, 2020.

45.     Plaintiff Carter factually believes SBA retaliated against him for a letter dated April 6, 2020 (See Exhibit 1, attached hereto and incorporated by reference herein for all intended purposes.) written to SBA Administrator Jovita Carranza requesting guidelines that would ensure processing of loans and disbursement of funds to community small businesses in compliance with HR BILL 748 and or C.A.R.E.S. ACT 2020.

On April 9, 2020 (See Exhibit 2, attached hereto and incorporated by reference herein for all intended purposes.) Plaintiff Carter made a Press Release challenging the SBA Administrator Jovita Carranza for not instituting guidelines that would protect African Americans. Mr. Carter's April 9, 2020 Press Release caused Congress to write the SBA Administrator Jovita Carranza on April 10, 2020 (See Exhibit 3, attached hereto and incorporated by reference herein for all intended purposes.) requesting that SBA issue final guidance on allowing applicants to determine the amount of the EIDL Grant for $1,000.00 and up to $10,000.00 of the applicant's choice. Plaintiff Carter issued a fourth and final letter to SBA Jovita Carranza on April 26, 2020 (See Exhibit 4, attached hereto and incorporated by reference herein for all

intended purposes.) requesting guidelines she issued to protect and prevent discriminatory practices against African Americans and Hispanic Community. Finally, Plaintiff Carter felt it necessary to lead protest against SBA in five different States to include Texas, Illinois, Michigan, Ohio, and Georgia.

46.     As of the date of the filing of this Complaint, Plaintiff Carter has not received any funding for his companies or any companies where his name is attached through the EIDL Grants.

## V.     CLASS ALLEGATIONS

47.     Plaintiff bring this claim for violations of Plaintiffs' rights to equal protection under the Fifth Amendment to the United States Constitution pursuant to Federal Rule of Civil Procedure 23 on behalf of: **All minority and woman-owned non-employer businesses**.

48.     Upon information and belief, there are millions of minority and woman-owned, non-employer businesses that have suffered discrimination based on the guidelines set forth by the SBA prohibiting such businesses from applying for the PPP program contemporaneously with its employer counterparts.

49.     Plaintiffs are class members, and Plaintiffs' legal claims are typical of the claims of other class members. Plaintiffs have no interests that are antagonistic to, or in conflict with the interests of other class members.

50.     Plaintiffs will fairly and adequately represent the class and all interests, and they have retained competent and experienced counsel who will effectively represent the interests of the entire class.

51.     Questions of law and fact are common to the class, and include whether the SBA's guidelines had a disparate impact on minority and women-owned small businesses.

52.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over any questions affecting only individual class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The damages suffered by individual class members are small compared to the expense and burden of individual prosecution of this litigation. In addition, class certification is superior because, *inter alia*, it

will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments about Defendants' guidelines and actions.

53.     Members of the proposed class are readily ascertainable, as the United States government and its agencies regularly collect and maintain information regarding minority-owned and woman-owned Non-employer Businesses.

54.     This action satisfies the numerosity, typicality, adequacy, predominance and/or superiority requirements under applicable law.

55.     8 million firms in the United States were owned by minorities in 2012, with 88.6% of those being Non-employer Businesses.  9.9 million firms in the United States were owned by women, with 89.5% of those being Non-employer Businesses. As a result, the class is so numerous that joining all members in a single action is impracticable. The disposition of these claims will provide substantial benefit to the class.

56.     *Commonality/Predominance.* There is a well-defined community of interest and common questions of law and fact, which predominate over any questions affecting only individual members of the class. Plaintiffs' claims are about the SBA's discrimination against minority-owned and woman-owned Non-employer Businesses through its guidelines issued to govern the PPP loan program. Common legal and factual questions, which do not vary among members of the class, and which may be determined without reference to the individual circumstances of class members, include, but are not limited to:

a.      Whether Defendants' actions in prohibiting sole proprietors, self-employed, and independent contractors from applying with the other small businesses with less than 500 employees were discriminatory against minority-owned and woman-owned Non-employer Businesses?

b.      Whether Defendants' actions in prohibiting sole proprietors, self-employed, and independent contractors from including expenses such as retirement, health insurance, and other expenses in calculating the total loan amount were discriminatory against minority-owned and woman-owned Non-employer Businesses?

c.      Whether Defendants' actions in reducing the forgivable portion of the loan only for sole

proprietors, self-employed, and independent contractors to eight weeks of net profits based on the fact that the SBA believes "many such individuals operate out of either their homes, vehicles, or **sheds** and thus do not incur qualifying mortgage interest, rent, or utility payments"[7] were discriminatory against minority-owned and woman-owned Non-employer Businesses? (emphasis added).

57.     *Typicality.* The representative Plaintiffs' claims are typical of the claims of the class. The Plaintiffs are each minority owned Non-employer Businesses. Plaintiff Infinity is also a woman-owned Non-employer Business. The only difference among class members will be the amount of damages sustained by the members of the class, which does not affect liability and does not bar certification.

58.     *Adequacy of Representation.* Plaintiffs will fairly and adequately protect and pursue the interests of the members of the class. Plaintiffs understand the nature of the claims herein, and its role in these proceedings. They will vigorously represent the interest of the class. Plaintiffs have retained class counsel who are experienced and qualified in employment and complex cases. Neither Plaintiffs nor its attorneys have interests which are contrary to or conflict with those of the class.

59.     *Superiority/Manageability.* A class action is superior to all other available methods for the fair and efficient adjudication of this action. There are millions of minority-owned and women-owned Non-employer Businesses subject to the Defendants' discriminatory practices and guidance. Individual litigation of the claims of class members is economically unfeasible and procedurally impracticable. The individual damages incurred by each member of any class resulting from Defendants' common and systemic wrongful conduct likely will be too small to warrant the expense of individual suits. Further, the Court would be unduly burdened by individual litigation of cases raising the same common questions. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the Court resulting from multiple trials of the same factual and legal issues.

---

[7] https://home.treasury.gov/system/files/136/Interim-Final-Rule-Additional-Eligibility-Criteria-and-Requirements- for-Certain-Pledges-of-Loans.pdf

## COUNT I

### VIOLATION OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION EQUAL PROTECTION

60.     Paragraphs 1 to 58 are incorporated as though fully set forth herein.

61.     Plaintiffs and class members are individuals or entities entitled to protection under the U.S. Constitution.

62.     The guidance provided by Defendants for implementation of the CARES Act violated and was contrary to the Fifth Amendment of the U.S. Constitution because it discriminated against Non-employer Businesses based on race and gender.

63.     The SBA's guidance blocked minority-owned and woman-owned Non-employer Businesses from having a fair chance to apply, and in some cases out right prohibited application, for the PPP loan under the CARES Act, while it allowed larger, non-minority and non-woman.

64.     As mentioned previously, 8 million firms in the United States were owned by minorities in 2012, with 88.6% of those being Non-employer Businesses. 9.9 million firms in the United States were owned by women, with 89.5% of those being Non-employer Businesses.

65.     The SBA knew full well the discriminatory impact the guidance would have on those minority and woman-owned Non-employer Businesses, which was a motivating factor for setting forth the guidance.

66.     As a direct and proximate result of the unconstitutional guidance, Plaintiffs have suffered and will continue to suffer irreparable injuries including but not limited to financial ruin,

business ruination, and the violation of the rights protected by the Fifth Amendment of the United States Constitution.

## IMPACT STATEMENT

The Plaintiffs are requesting $150 Billion to ensure that 2 Million U.S.A. Community Small Business doors remain open after COVID-19 is no longer a threat. These businesses are in Undeserved and Rural Markets and not funded in two rounds of funding under the C.A.R.E.S A.CT. The most neglected groups of Community Small Businesses have been barbers, hairstylist, local bars, mom and pop restaurants, restaurant servers, barbershop owners, salon owners, small churches, youth organizations, small non-profits, massage therapists, promoters, rideshare drivers and gig workers such as artists, actors, comedians, and music artists.

The requested funds will provide up to $75,000.00 in assistance for each business. The necessary services to develop a solid economic foundation for each company will be covered in the funds allocated for each company. Some of the services would include Accounting, Bookkeeping, Payroll Protection, Insurance, Marketing, and a Business Manager/Coach. The business manager/coach's mission is to ensure once the business has is Rescued, Restored, and Recovered, it will sustain itself.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the class seek the following relief:

a.       An order certifying the proposed class pursuant to Fed. R. Civ. P. 23;

b.       grant judgment against Defendants, jointly and severally, in favor of Plaintiffs and the class

for all damages suffered by Plaintiffs and the class, including pre-judgment and post- judgment interest;

c.       litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law;

and

d.       such other and further relief as this Court deems just and proper.

Dated: June 19, 2020

Respectfully submitted,

*/s/ Robert W. Haiges*
**Robert W. Haiges, OB#17196**
**ROBERT W. HAIGES P.C.**
**P. O, 1187**
**Edmond, Ok. 73083**
**405-478-1188 - Telephone**
**405-478-5501 - Facsimile**
**haigesr@yahoo.com -Email**
**Counsel for Plaintiffs**

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial as to all claims so triable.

16





**COMMUNITY SMALL BUSINESSES**

Bruce Carter
Coalition Spokesperson
bcarter@csbcoalition.com

April 6th, 2020

The Honorable Jovita Carranza
Mrs. Administrator of the US Small Business Administration
409 Third Street, SW
Washington, DC 20416

Dear Administrator:

Rescuing Community Small Business is a national coalition led by business professionals, 501C(3)'s and 501C(4) founders. Our mission as it relates to COVID-19 is to reduce any potential discriminatory practices and total disregarding of the Sense of The Senate in H.R. 748 the C.A.R.E.S ACT as it relates to ensuring the processing and disbursements of loans in underserved and rural markets, and small business concerns owned and controlled by socially and economically disadvantaged individuals, women, and businesses in operation for less than 2 years. The coalition understands that the Community Small Business (CSB) must have its own rescue, recovery and restoration package in order to survive this unprecedented crisis caused by COVID-19. The coalition classifies a Community Small Business as a business with 1 to 10 employees, annual revenues under $800,000.00 and generally serves its customers weekly.

CSB's are historically located in urban underserved census tracts, rural communities and zip codes with high levels of poverty. CSB's must have a different guideline to qualify for COVID-19 Economic Injury Disaster Loans via the 2020 Coronavirus stimulus package. Based on traditional guidelines and practices CSB's will not receive funding if the guidelines are not adjusted. This non-action would be equivalent to handing down a DEATH SENTENCE to someone that hasn't committed a crime.

CSB's typically employ the unemployable or provide income opportunities for the homeless and individuals suffering from addictions or mental illnesses. Simply put, allowing one to pick up the trash, sweep the business floor, take out the trash or provide overnight security makes many communities function harmoniously. Additionally, they are the backbones to local youth organizations and community activities.

In the event CSB's are left behind it will create higher crime rates, increase poverty, civil unrest within these communities and many will bypass recession and suffer the worst depression in America's history. The bottom line is once America recovers from COVID-19 these businesses will remain closed forever unless we stand up for them now!!!

CSB's owners normally work 60 to 80 hours per week but lack marketing and management training *causing* the business too often survive on a weekly basis. Benefiting CSB's will be required to keep their staff intact,

provide community services where applicable, participate in financial literacy and business development training. The CSB coalition believes these requirements will provide a solid foundation and enhance the ability to repay any loan.

CSB Coalition has built a top tier level of community partners which includes; financial institutions, attorneys, accountants, and professional service providers, young adults ages 16-25, restaurant servers, barbers, hairstylists, and overcomers.

In order to have a positive impact on America's underserved and rural communities during this uncertainty of economic conditions due to COVID-19, one of our CSB's www.iTHINKSolutions.us has developed a methodology that will do the following on a national level:

1.       458,000  Full-Time jobs protected or created
2.    1,500,000  Part-time/ seasonal jobs protected or created
3.       100,000  Food Production Centers aka (Mom and Pop Restaurants)
4.  200,000,000  Daily Meal Production Capacity / Delivery
5.  100,000,000  Americans Served Daily

Additional Benefits:

1.  National Food Access Supply Chain that will serve all 2000 plus counties in America
2.  Keep Community Small Businesses Doors Open
3.  Protect CSB Workforce
4.  Create New Jobs
5.  Infusion of cash in multiple industries such as retail, rental cars, hotels, and several others
6.  Assist with Outreach, Technical Assistance, Training, Processing and Packaging of loans
7.  Addressing the mental needs of 2020 High School Seniors
8.  Assist in flattening the curve and starving COVID-19
9.  Assist with 2020 Census Hard To Count
10. Reduce Domestic Violence and Criminal Activities

There is no rural dirt road we are not prepared to travel nor an urban community we are afraid to serve. All we need are the resources to fulfill the mission and unite America. The CSB coalition respectfully requests the opportunity to expeditiously discuss our proposal with you at this unprecedented time in the lives of all Americans.

Sincerely,

*Bruce Carter*

Bruce Carter
CSB Spokesperson
202-907-1760 Direct Cell





**COMMUNITY SMALL BUSINESSES**

Bruce Carter
Coalition Spokesperson
bcarter@csbcoalition.com

FOR IMMEDIATE RELEASE                    WEDNESDAY, APRIL 09, 2020

## COVID-19 COULD HAVE SLAVERY AND MASS INCARCERATION LIKE EFFECT ON AFRICAN AMERICANS

The fact that socially and economically disadvantaged African Americans are dying of COVID-19 does not shock those that are on the ground. Before data being released by government agencies on the disparities in deaths, SBA Administrator Jovita Carranza was sent a letter on April 06, 2020, requesting she ensure that community small businesses not be discriminated against as it relates to PPP loans. The discrimination of community small businesses would remove any chance of connecting with and educating younger and poor African Americans on the importance of social distancing.

Community Small Businesses located in underserved urban cores and rural communities can connect directly with the people. Some Community Small Businesses such as Barber Shops, Hair Salons, Smaller Non-Profits, Mom and Pop Restaurants, are vital in flattening the curb and saving lives. Unfortunately, they must have a different set of guidelines to qualify and receive funding via H.R. 748. The current guidelines demonstrate a disconnect between the current Administration and America's Community Small Businesses. Any non-action by the SBA would be equivalent to handing down a DEATH SENTENCE to someone that hasn't committed a crime.

When a barber goes to cut hair at someone's home to make money, community spread will happen, and death is imminent.

https://www.witv.com/news/brookhaven-man-dies-of-covid-19-family-pleads-for-social-distancing-practice/

As of 4/09/2020, not one African American Community Small Business had received an EIDL Loan Advance or Paycheck Protection Program (PPP) Loan.

In cities like Philadelphia, Baltimore, Atlanta, Jackson, Mississippi, and other cities with a high African American population on the rise, the body count could be unconscionable. The current

Administration must not allow America's historical lack of value for African Americans to prevail in this unprecedented crisis caused by COVID-19.

We are requesting the following:

1. Funds to launch a national marketing campaign targeting young African Americans and socially and economically disadvantaged communities as part of the solution to saving lives.
2. A meeting with SBA Administrator Jovita Carranza
3. A meeting with The White House and Secretary Steve Mnuchin as it relates to the next phase of funding and direct funding for Community Small Businesses
4. The White House, each U.S. Senate, and U.S. House Representatives of Congress insist that the EIDL Loan Advance of $10,000.00 not be based on the number of employees. This action would discriminate against Community Small Businesses.
5. Breakdown of each entity that has received funds, the date they applied, what lender closed their loan, and the amount funded

The negative impact of Slavery and Mass Incarceration that many often overlook is the broken family structure caused by the removal of a critical family member.  COVID-19 is killing African American patriarchs, matriarchs, and the working class.

Many Americans see this 2.2 Trillion Dollar package thus far as a failure as it relates to the everyday American, by totally disregarding the needs of economically and socially disadvantaged Community Small Businesses. While the Sense of The Senate in H.R. 748 states the importance of these businesses, yet the equitable disbursement of funds demonstrates the opposite.

###########################################################################

For More Information on CSB Coalition visit: https://www.csbcoalition.com/

CSB Coalition is a national agency led by business professionals, 501C(3)'s and 501C(4) founders. The agency focuses on the survival and growth of minority-owned and rural Community Small Businesses (CSB). CSB's are historically underserved in America due to a lack of representation and geographical location.  The coalition classifies a Community Small Business as a business with 1 to 10 employees, annual revenues under $800,000.00, and generally serves its customers weekly.

The alliance focuses on ensuring that underserved areas and rural markets, including small business concerns, owned and controlled by socially and economically disadvantaged individuals (as defined in section 8 (d)(3)(C), women, and businesses in operation for less than two years are provided funding and support by the SBA.

Congress of the United States
Washington, DC 20515


Exhibit
3

April 10, 2020

The Honorable Steven Mnuchin
Secretary
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220

The Honorable Jovita Carranza
Administrator
Small Business Administration
409 3rd Street, SW
Washington, DC 20416

Dear Secretary Mnuchin and Administrator Carranza,

The City of New York's small businesses and entrepreneurs are suffering immensely as a result of the Coronavirus (COVID-19).  Since March 22, New York has been under a statewide stay-at-home order to slow the spread of the novel Coronavirus to help flatten the curve. This order effectively shuttered all non-essential small businesses throughout the city.  In New York, 98 percent of all businesses are small, with fewer than 100 employees, and 89 percent are very small employing fewer than 20 individuals.  The impact of the pandemic on our local economy is dire and can be seen in the 810,000 unemployment claims made by New Yorkers since March 9th.[1]

To address the unprecedented challenges facing small businesses, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, a $2.2 trillion stimulus bill, which contains funding for a wide range of programs designed to help respond to the economic downturn caused by the COVID-19 pandemic.  Specific to the SBA and our small business owners, Congress created a new loan forgiveness program and grants to help keep small businesses afloat during this unprecedented crisis.

The Paycheck Protection Program (PPP) received $349 billion in funding to inject into our nation's struggling small businesses.  The program will provide forgivable, low-interest loans to small businesses to pay employees, keep them on the payroll, and keep the businesses viable.  To that end, Congress created basic requirements, including eligibility, loan size, and forgiveness criteria, to reach small businesses as quickly as possible while also providing lenders with the tools they need to deliver this vital support.

The CARES Act also created a new, immediate disaster grant at the SBA.  Using the current economic injury disaster loan (EIDL) program, these grants were designed and intended to deliver a quick infusion of capital, based simply on applicants self-certifying that they are eligible. Further, grant recipients are not precluded from applying for PPP loans or continuing to pursue disaster loans.

[1] Edwards, Jesse, "NY Launching New Unemployment Site That Won't Require Phone Call, 200K NYers Still in Limbo", NBC New York, accessed on April 9, 2020, https://www.nbcnewyork.com/news/local/ny-to-launch-new-unemployment-site-that-doesnt-require-phone-call-more-than-200k-new-yorkers-still-waiting/2367386/

We are concerned that these programs are not being implemented as Congress intended. Beginning on Tuesday, March 31st, the SBA and the Treasury Department posted guidance on their websites to implement the PPP.[2] Since then, due to the lack of formal Standard Operating Procedures, borrowers and lenders have been forced to rely on an incomplete and ever-changing list of questions and answers issued by your agencies. Unfortunately, this guidance continues to leave out vital information about eligibility of businesses and nonprofits, guidance for lenders on how to close loans, and adds new requirements that were not part of the law.

Of particular concern, the SBA adopted the "first-come, first serve rule," which provides no assurances that the most vulnerable small businesses will have access to the forgivable loans. Coupled with reports that many lenders are currently only making PPP loans to their existing customers, we fear that without full guidance, traditionally underserved small businesses in urban areas hit hard by the pandemic, like New York City, will be left behind. The guidance also established a 75/25 percent rule that could conceivably limit the amount of loan forgiveness for small businesses, particularly those in New York City with steep rents. We need to ensure the program will be there and workable for New York's microbusinesses - the shops and corner stores that are woven into the fabric of our communities.

Turning to the EIDL grants, which Congress intended to provide a quick infusion of cash to help small businesses pay their rent and other bills, SBA has failed to issue final guidance and award grants in a manner consistent with Congressional intent. The SBA has metered the amount of the EIDL grant to $1,000 per employee, even though Congress specifically stated that the applicant, not the agency, has the sole authority to determine how much grant money they receive up to $10,000. Moreover, the law requires SBA to issue advances within three days of receipt of applications, yet small business owners say they are still waiting weeks after applying.

The SBA has also been plagued by IT system issues that have contributed to delays in making loans. We have heard numerous reports about the Etran system crashing which prevents lenders from processing loans. Constituents have also reported being kicked out of the EIDL system and having to restart the time-consuming process of applying for a disaster grant.

Finally, the SBA has lacked transparency in reporting results from these programs to Congress and the American people. At a time when swift execution is required to stem this economic crisis, it is imperative that we know details on program implementation. The SBA must establish a daily tracking of key data and information such as how many loans and grants are being processed by participating lenders and the agency, how much money is being allocated to small businesses, size of businesses served, demographics of business owners, and geographic distribution of awards across the country. This reporting is central to our Congressional oversight responsibilities to ensure program performance. Furthermore, we need to know the spend rates in these programs so action can be taken to appropriate the necessary funds to ensure all eligible small businesses have access to this critical assistance.

---

[2] Assistance for Small Businesses, U.S. Department of the Treasury, accessed on April 9, 2020 at https://home.treasury.gov/policy-issues/top-priorities/cares-act/assistance-for-small-businesses ; Coronavirus (COVID-19): Small Business Guidance & Loan Resources, U.S. Small Business Administration, accessed on April 9, 2020 at https://www.sba.gov/page/coronavirus-covid-19-small-business-guidance-loan-resources

These are just a few of the many issues that we are hearing from small business owners and lenders in our communities.  In sum, we are deeply troubled by the lack of clear, coherent guidance for small businesses during this crisis, and we urge you to release formal comprehensive Standard Operating Procedures immediately to put all small businesses on an equal playing field and give lenders the clarity they need to process and disburse loans.  We further request that you provide Congress with daily reporting on SBA's programs in response to the COVID-19 pandemic.

Sincerely,

Nydia M. Velázquez
Member of Congress

Charles Schumer
United States Senator

Kirsten Gillibrand
United States Senator

Jerrold Nadler
Member of Congress

Yvette Clarke
Member of Congress

Hakeem Jeffries
Member of Congress

Alexandria Ocasio-Cortez
Member of Congress

Thomas R. Suozzi
Member of Congress

Eliot L. Engel
Member of Congress

Grace Meng
Member of Congress

Carolyn B. Maloney
Member of Congress

Kathleen M. Rice
Member of Congress

Gregory Meeks
Member of Congress

Adriano Espaillat
Member of Congress

José E. Serrano
Member of Congress



**COMMUNITY SMALL BUSINESSES**

Exhibit
4

CSB Coalition
info@csbcoalition.com

4/26/2020

Jovita Carranza
SBA Administrator
409 Third Street, SW,
Washington, DC 20416

RE: Requesting streamline guidelines for PPP LOANS in Underserved and Rural Markets for Economically and Socially disadvantages Individuals.

Mrs. Carranza,

According to HR 748, and the SENSE of the SENATE Sec 1102, concerned businesses covered loans in underserved and rural markets were to be prioritized as it related to processing and disbursement. Micro-small businesses, also known as Community Small Businesses under the current SBA guidelines, have been overlooked for PPP loan funding. Please read the law below and forward the guidelines you issued to agents and lenders to prevent further discriminatory practices.

"It is the sense of the Senate that the Administrator should issue guidance to lenders and agents to ensure that the processing and disbursement of covered loans prioritizes small business concerns and entities in underserved and rural markets, including veterans and members of the military community, small business concerns owned and controlled by socially and economically disadvantaged individuals (as defined in section 8(d)(3)(C)), women, and businesses in operation for less than 2 years."

Additionally, the coalition is requesting the immediate issue of the following guidelines to avoid more egregious behavior that would further decimate African American and Hispanic communities.

Applicant Good Faith Certification is utilized in place of 940, 941, 944 payroll tax reports, or 1099's because these documents are generally not available in the demographic identified in the Sense of the Senate.  The Good Faith Certification covers the following:

1. Applicants intended use of PPP covered loan.
2. Calls for a budget for the 8 weeks of covered loan funds
3. Certification that required documentation for expended covered loan funds is prepared by a 3rd party and provided to the lender, within the time required by H.R.748.
4. CSB applicants fully understand the liabilities of not utilizing the funds for the purpose stated.

The above guidelines can accomplish the following:

1. Provide funds expeditiously to the most vulnerable businesses
2. Remove the lender's discretion and concern that SBA might not back the loan
3. Provide the government a recourse for fraudulent activity

Our coalition has developed three models that address our countries current reality as a result of COVID-19. The three models focus on Relief, Restoration, and Recovering:

1. Rescuing Community Small Businesses
2. Masking The Underserved
3. Keeping Our Doors Open KODO

CSB is confident these guidelines can accomplish the real intent of the current administration while following the law as outlined in HR 748.

Sincerely,

*Bruce Carter*

Bruce Carter
CSB Spokesperson
202-907-1760 Direct Cell

5/8/2020          Body of Works Mail - Determination of Eligibility

 **Gmail** by Google

Bruce Carter <bcarter@valueofalife.us>

## Determination of Eligibility

Bruce Carter <bcarter@valueofalife.us>         Wed, Apr 29, 2020 at 2:18 PM
To: derenda.fisher@sba.gov, Carole Davis <Carole.Davis@simmonsbank.com>, "Logan, Cherita"
<cherita.logan@mail.house.gov>

Mrs. Fisher,

I spoke with you last week as it related to determining the eligibility of a company being in operations versus formation.
You indicated that as long as I could demonstrate expenses due to doing business, that would be sufficient.

The lender understandably requires a letter from SBA. I am sure to protect their interest. I need your assistance in this
matter. I requested congressional aid last week and will be forwarding their response momentarily.

I have also attached a Texas Workforce Separation Letter for one of our 18 paid independent contractors last year that
was apart of our research and development team. Additional documentation includes legal work performed by a
third party. Due to processing and limited funds, it would be much appreciated if you could and clarity today.

Bruce Carter
Director
202-907-1760
www.valueofalife.us

"Which person is worse, the one that created the problem? or the one that knows of the problem but
does nothing to fix it?" Bruce Carter

📄 **Separation of Work-20200429140257.pdf**
642K

